No. 22-56199

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

YUGA LABS, INC.,

*Plaintiff-Appellee*,

*v.*

RYDER RIPPS, JEREMY CAHEN,

*Defendants-Appellants*,

*and*

DOES 1–10,

*Defendants.*

On Appeal from the United States District Court
for the Central District of California, No. 2:22-cv-04355 (Walter, J.)

## BRIEF FOR APPELLANTS RYDER RIPPS AND JEREMY CAHEN

THOMAS G. SPRANKLING
WILMER CUTLER PICKERING
    HALE AND DORR LLP
2600 El Camino Real
Suite 400
Palo Alto, CA 94306
(650) 858-6062

HENRY M. NIKOGOSYAN
WILMER CUTLER PICKERING
    HALE AND DORR LLP
350 South Grand Avenue
Suite 2400
Los Angeles, CA 90071
(213) 443-5316

LOUIS W. TOMPROS
ANDREW P. MELENDEZ
WILMER CUTLER PICKERING
    HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6886

ANDREW K. WAKS
WILMER CUTLER PICKERING
    HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20006
(202) 663-6297

February 21, 2023

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................ iii

INTRODUCTION ..................................................................................... 1

JURISDICTION ........................................................................................ 3

ISSUES ON APPEAL ............................................................................... 4

CONSTITUTIONAL AND STATUTORY PROVISIONS
    INVOLVED ......................................................................................... 4

STATEMENT ............................................................................................ 5

    A.    Non-Fungible Tokens ("NFTs") ...................................... 5

    B.    Ripps's Work As A Commentator On The Boundaries
        Between Art, The Internet, And Commerce ........................ 6

    C.    Mr. Ripps Creates The RR/BAYC Project To Criticize
        Yuga Labs' Bored Ape Yacht Club Line Of NFTs ............. 8

    D.    Yuga Files Suit In Order To Silence Mr. Ripps Without
        Having To Directly Challenge The Veracity Of His
        Statements ...................................................................... 14

SUMMARY OF THE ARGUMENT .................................................... 18

ARGUMENT ......................................................................................... 20

I.    THE DISTRICT COURT ERRED IN HOLDING APPELLANTS DID NOT
    SATISFY THE THRESHOLD SHOWING THAT YUGA'S STATE LAW
    CLAIMS AROSE FROM AN ACT IN FURTHERANCE OF PROTECTED
    SPEECH ...................................................................................... 20

II.    HAD THE DISTRICT COURT APPLIED THE PROPER "ARISING
    FROM" STANDARD, YUGA WOULD NOT HAVE BEEN ABLE TO
    ESTABLISH A PROBABILITY OF PREVAILING ON ITS STATE LAW
    CLAIMS ...................................................................................... 26

A.    Yuga's State Law Trademark Claims Fail Under The *Rogers* Free Speech Test ....................................................26

      1.    The RR/BAYC NFTs are an expressive work.........................27

      2.    The RR/BAYC NFTs have artistic relevance and are not explicitly misleading.......................................30

B.    In The Alternative, Yuga's State Law Trademark Claims Fail Because Ripps's Use Of Yuga's Marks Is Nominative Fair Use ...........................................................32

C.    Yuga's Remaining State Law Claims Fail .........................37

      1.    Yuga's conversion claim fails.................................37

      2.    Yuga's claim for intentional interference with prospective economic advantage fails ......................39

      3.    Yuga's claim for negligent interference with prospective economic advantage fails ......................40

CONCLUSION ....................................................................42

STATEMENT OF RELATED CASES ....................................43

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Applied Underwriters, Inc. v. Lichtenegger*, 913 F.3d 884 (9th Cir. 2019) .............................................................33, 34, 35

*Battle v. Taylor James, LLC*, 2022 WL 2162930 (C.D. Cal. June 15, 2022) ..........................................................................11

*Board of Trustees of State University of New York v. Fox*, 492 U.S. 469 (1989)......................................................................3, 25

*Cariou v. Prince*, 714 F.3d 694 (2d Cir. 2013).................................7, 25

*Cohen v. California*, 403 U.S. 15 (1971).................................................23

*Cross v. Facebook*, 14 Cal. App. 5th 190 (2017) ...................................24

*Denims v. Ram Imports, Inc*, 2021 WL 4814995 (C.D. Cal. Mar. 5, 2021) ..........................................................................41

*Dr. Seuss Enterprises, LP v. ComicMix LLC*, 983 F.3d 443 (9th Cir. 2020) .....................................................................27, 31

*E.S.S. Entertainment 200, Inc. v. Rock Star Videos, Inc.*, 547 F.3d 1095 (9th Cir. 2008) .............................................27, 30, 31

*Edge v. City of Everett*, 929 F3d 657 (9th Cir. 2019).......................28, 29

*English & Sons, Inc. v. Straw Hat Restaurants, Inc.*, 176 F. Supp. 3d 904 (N.D. Cal. 2016) .............................................................38

*Equilon Enterprises v. Consumer Cause, Inc.*, 52 P.3d 685 (Cal. 2002) ...............21

*Gordon v. Drape Creative, Inc.*, 909 F.3d 257 (9th Cir. 2018)..................26, 27, 30

*Greater Los Angeles Agency on Deafness, Inc. v. Cable News Network, Inc.*, 742 F.3d 414 (9th Cir. 2014) ..................................26

*Heitkoetter v. Domm*, 2022 WL 16748731 (E.D. Cal. Nov. 7, 2022) ......................6

*Hilton v. Hallmark Cards*, 599 F.3d 894 (9th Cir. 2010) ............................4, 17, 25

*Hsu v. OZ Optics Ltd.*, 211 F.R.D. 615 (N.D. Cal. 2002) .......................................41

*Innospan Corp. v. Intuit, Inc.*, 2010 WL 5017014 (N.D. Cal. Dec. 3, 2010) ..................................................................................................37

*J'Aire Corp. v. Gregory*, 598 P.2d 60 (Cal. 1979) .................................................41

*Jordan-Benel v. Universal City Studios, Inc.*, 859 F.3d 1184 (9th Cir. 2017) ..................................................................................................20

*Ketab Corp. v. Mesriani Law Group*, 2016 WL 5920291 (C.D. Cal. Jan. 29, 2016) ........................................................................................41

*Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988 (9th Cir. 2018) .....................11

*Korea Supply Co. v. Lockheed Martin Corp.*, 63 P.3d 937 (Cal. 2003) .................40

*Kremen v. Cohen*, 337 F.3d 1024 (9th Cir. 2003) ..................................................39

*Kronemyer v. Internet Movie Database, Inc.*, 150 Cal. App. 4th 941 (2007) ..................................................................................................24

*Langer v. Kiser*, 57 F.4th 1085, (9th Cir. 2023) .....................................................21

*Makaeff v. Trump University, LLC*, 715 F.3d 254 (9th Cir. 2013) ...........................6

*Marin Tug & Barge, Inc. v. Westport Petroleum, Inc.*, 271 F.3d 825 (9th Cir. 2001) ...............................................................................39

*Mattel Inc. v. Walking Mountain Productions*, 353 F.3d 792 (9th Cir. 2003) ......................................................................................25, 33, 35, 36

*Meeker v. Meeker*, 2004 WL 2554452 (N.D. Cal. Nov. 10, 2004) .........................37

*Metabolife International, Inc. v. Wornick*, 264 F.3d 832 (9th Cir. 2001) .....................................................................................................2

*Mindys Cosmetics, Inc. v. Dakar*, 611 F.3d 590 (9th Cir. 2010) ...........................25

*Muniz v. United Parcel Service, Inc.*, 738 F.3d 214 (9th Cir. 2013) ......................37

*Murdock v. Commonwealth of Pennsylvania*, 319 U.S. 105 (1943) ......................26

*Nam v. Alpha Floors*, 2017 WL 11635994 (C.D. Cal. Jan. 4, 2017) .....................38

*National Medical Transportation Network v. Deloitte & Touche*, 62
    Cal. App. 4th 412 (1998) .................................................................40

*Navellier v. Sletten*, 52 P.3d 703 (Cal. 2002) ....................................22, 24

*New Kids on the Block v. News America Publishing, Inc.*, 971 F.2d
    302 (9th Cir. 1992) ...........................................................33, 34, 36

*Padgett v. Loventhal*, 706 F.3d 1205 (9th Cir. 2013) ...............................37

*Planet Aid, Inc. v. Reveal*, 44 F.4th 918 (9th Cir. 2022) ........................20

*Planned Parenthood Federation of America Inc. v. Center for
    Medical Progress*, 890 F.3d 828 (9th Cir. 2018) ...................20, 21

*Punchbowl, Inc. v. AJ Press, LLC*, 52 F.4th 1091 (9th Cir. 2022) .............25, 27, 32

*Rogers v. Grimaldi*, 875 F.2d 994 (9th Cir. 1989) ..................................27

*Sarver v. Chartier*, 813 F.3d 891 (9th Cir. 2016) ...................................24

*Stolz v. Wong Communications LP*, 25 Cal. App. 4th 1811 (1994) .......................41

*Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137 (9th Cir.
    2008) .................................................................................40

*Taus v. Loftus*, 151 P.3d 1185 (Cal. 2007) ...........................................21

*Trilogy at Glen Ivy Maintenance Ass'n v. Shea Homes, Inc.*, 235 Cal.
    App. 4th 361 (2015)..................................................................3, 22

*Twentieth Century Fox Television v. Empire Distribution, Inc.*,
    875 F.3d 1192 (9th Cir. 2017) .........................................27, 29, 31

*United States v. Ritchie*, 342 F.3d 903 (9th Cir. 2003)...........................11

*Wallace v. McCubbin*, 196 Cal. App. 4th 1169 (2011) ...........................26

*Westside Center Associates v. Safeway Stores 23, Inc.*, 42 Cal. App.
    4th 507 (1996)..................................................................40

## DOCKETED CASES

*Andy Warhol Foundation v. Goldsmith*, No. 21-869 (U.S.)......................7

## CONSTITUTIONS, STATUTES, AND RULES

U.S. Const. amend. I ................................................................................4

15 U.S.C. §§ 1051 *et seq.* ........................................................................3

17 U.S.C. § 512 ......................................................................................14

28 U.S.C.
     § 1331 ...........................................................................................3
     § 1338 ...........................................................................................3
     § 1367 ...........................................................................................3

Cal. Code Civ. Proc. § 425.16 ..................................................3, 4, 16, 17, 21, 24

Fed. R. Civ. Proc. 12 ..........................................................16, 17, 21, 37

## OTHER AUTHORITIES

Congressional Research Service, *Non-Fungible Tokens (NFTs)*
     (July 20, 2022), https://crsreports.congress.gov/
     product/pdf/R/R47189 ...............................................................5

*McCarthy on Trademarks and Unfair Competition* § 25:70 (5th ed.
     2022) ........................................................................................38

**INTRODUCTION**

Appellee Yuga Labs is a multi-billion-dollar company that specializes in non-fungible tokens ("NFTs").  Their most famous collection of NFTs is the Bored Ape Yacht Club, which involves portraits of cartoon apes with various facial expressions and costumes.  A "Bored Ape" NFT is, in essence, an entry on a digital ledger that includes a link to a particular ape image.  These ledger entries are recorded on the distributed digital ledger known as the Ethereum blockchain, which can associate them with digital accounts colloquially referred to as "owners."  *See infra* pp. 5-6 (explaining concept of NFTs).

Appellants Ryder Ripps and Jeremy Cahen believe that the Bored Ape NFTs contain racist and antisemitic imagery.  Ripps in particular has spoken out on this issue on social media and on a website that explores the problematic images in detail.  And because Ripps is an artist by profession, he has incorporated that criticism into his work—most recently, using appropriation art (i.e., art that uses pre-existing objects or images to make a point, like Andy Warhol's Campbell's Soup Cans) known as the RR/BAYC project.  The project serves both to make Appellants' critiques of the Bored Ape NFTs available to a wider audience and to comment on what it means to "own" an NFT.

Specifically, the RR/BAYC project involves creating NFTs that include links to the same online digital images as the Bored Ape NFTs, but that use unique

and uncopiable entries on the blockchain.  That artistic device serves not only to critique the Bored Ape Yacht Club, but also to educate Appellants' audience that, contrary to popular understanding, an NFT does not, by itself, confer rights in a digital image.  Before an RR/BAYC NFT could be purchased from Ripps, the buyer was required to acknowledge that it was a "new mint of BAYC imagery, recontexualiz[ed] … for educational purposes, as protest and satirical commentary."  ER-18.

Yuga filed suit against Appellants, complaining that they had engaged in "a longstanding harassment campaign" that was "based on false accusations of racism."  ER-206, 226.  Rather than challenge Appellants' speech on the merits, however, Yuga's complaint raised exclusively trademark-infringement related claims.

California's anti-SLAPP statute was intended to stop such suits "aimed at chilling expression through costly, time-consuming litigation" in their infancy. *Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 839-840 (9th Cir. 2001).  But the district court denied Appellants' anti-SLAPP motion on the grounds that (1) Plaintiffs did not file a defamation claim and (2) Appellants sold their art rather than simply giving it away.  Both of these rulings were legal error.

California courts have made clear that the anti-SLAPP statute's applicability turns not on labels but on whether the gravamen of the claim challenges an act in

- 2 -

furtherance of protected expression. *Trilogy at Glen Ivy Maint. Ass'n v. Shea Homes, Inc.*, 235 Cal. App. 4th 361, 368 (2015). And the U.S. Supreme Court has long noted that "[s]ome of our most valued forms of fully protected speech are uttered for a profit." *Board of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 482 (1989).

While those errors alone warrant reversal, this Court can and should go a step further and address the legal sufficiency of Yuga's complaint. In particular, Yuga's state law trademark claims are barred as a matter of law under both the First Amendment and the doctrine of nominative fair use, which protects the use of another's trademark for purposes of criticism or comparison. Yuga's remaining state law claims cannot survive without a valid trademark claim.

## JURISDICTION

The district court had jurisdiction pursuant to 28 U.S.C. §§ 1331, 1338, and 1367. Yuga's claims are, in part, based on violations of the Lanham Act, as amended, 15 U.S.C. §§ 1051 *et seq*. The district court had jurisdiction over Yuga's state law claims pursuant to 28 U.S.C. §§ 1338(b) and 1367.

On December 16, 2022, the district court denied Appellants' special motion to strike Yuga's state law claims under Cal. Code Civ. Proc. § 425.16. ER-13–14. Appellants timely noticed this appeal on December 21, 2022. ER-248–252. This Court has jurisdiction to review the denial of an anti-SLAPP motion under the

collateral order doctrine. *Hilton v. Hallmark Cards*, 599 F.3d 894, 900 (9th Cir. 2010).

## ISSUES ON APPEAL

(1) Whether state law tort and trademark infringement claims "aris[e] from" "an act in furtherance of a person's right of petition or free speech" within the meaning of California's Anti-SLAPP statute where even the complaint acknowledges that the targeted conduct is a satire of Yuga's products that was produced as a form of protest.

(2) Whether Yuga's complaint alleged legally sufficient facts to support its alleged state law tort and trademark infringement claims.

## CONSTITUTIONAL AND STATUTORY PROVISIONS INVOLVED

**U.S. Const. amend. I**:  "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

**Cal. Code Civ. Proc. § 425.16(b)(1)**:  "A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless

the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim."

## STATEMENT

### A.    Non-Fungible Tokens ("NFTs")

An NFT is an entry on a decentralized digital ledger known as a "blockchain"—essentially, "a digital certificate[] of ownership" "of an associated digital or physical item."  Congressional Rsch. Serv., *Non-Fungible Tokens (NFTs)* 2-4 (July 20, 2022).[1]  "Owner," in this sense, is a strictly technological concept, and does not necessarily entail legal ownership.  For example, if a hacker were to steal an NFT, the blockchain would show the hacker as the "owner," despite the thief's inability to acquire title to stolen property.

Further, in contrast to "fungible" tokens, which are "identical and interchangeable" (think a Bitcoin or a $1 bill), NFTs are unique by design and cannot be copied.  *Non-Fungible Tokens* 2.  But NFTs also often link to other content, such as images, that are easily copied and are not necessarily the property of the NFT owner.  *Id.* at 4; *see also id.* at 1 (NFTs "do not necessarily represent the legal ownership of an asset or grant copyright to a digital or physical item").  In fact, "multiple NFTs could represent the same digital or physical item … although each NFT" (i.e., the certificate of ownership) would still be unique.  *Id.* at 2; *see*

---

[1] *Available at* https://crsreports.congress.gov/product/pdf/R/R47189.

*also* ER-69 ("Just as when you buy a painting, that doesn't mean you can sell the image in the painting to McDonalds to use as wallpaper in an Egg McMuffin ad.").

### B. Ripps's Work As A Commentator On The Boundaries Between Art, The Internet, And Commerce

Appellant Ryder Ripps is a visual artist and creative designer known for his work examining popular culture and shedding light on how individuals move through our increasingly digitized world. ER-16.[2] As the *New York Times* summarized a decade ago, he is "An Artist of the Internet," ER-42, and one who achieved prominence at a relatively young age, ER-45 (article in *Forbes* listing Mr. Ripps in the 2016 class of 30 Under 30: Art & Style). Mr. Ripps's work has included, for example, (1) the digital manipulation of photographs posted to Instagram to show how "authenticity [is] manipulated by multiple filters and amplified by mass circulation," and (2) an immersive installation entitled "Alone Together" that provided the observer with shifting perspectives on how a group of live participants/actors used the Internet. ER-50. Mr. Ripps has also provided creative direction for well-known companies like Nike and Red Bull and a wide

---

[2] The Court may consider Ripps's declaration and related exhibits in answering the threshold question of whether Yuga's claims target protected conduct within the meaning of the anti-SLAPP statute. *See Makaeff v. Trump Univ., LLC*, 715 F.3d 254, 262 n.5 (9th Cir. 2013); *see also Heitkoetter v. Domm*, 2022 WL 16748731, at *6 & n.9 (E.D. Cal. Nov. 7, 2022) (noting that "extrinsic evidence" may be used "in prong-one determinations under" the anti-SLAPP statute).

range of prominent musicians, including Grimes, James Blake, MIA, Pop Smoke, Pusha T, Tame Impala, and Travis Scott.  ER-16.

Over the years, Mr. Ripps's art has evolved with the pace of technology.  In 2021, for example, he experimented with the use of performance and appropriation art to comment on the purpose and nature of NFTs.[3]  He created and sold his own NFT linking to an image that was a near-duplicate of the image used for a particular "CryptoPunk" in the popular line of NFTs.  *See* ER-68 (explaining that "CryptoPunks are a set of 10,000 … NFTs, each token corresponding to a unique cartoonish figure").  Ripps explained that his creation and sale of facsimile CryptoPunk #3100 was meant to comment on the CryptoPunk creator's "motives, understanding of art, understanding of 'punk,' and understanding of cryptocurrency/NFT."  *Id.*  In particular, the artwork commented on what it means to "own" an NFT—i.e., to control a digital token ("ownership" certificate) but not the corresponding digital image.  ER-69.

---

[3] Appropriation art is "the more or less direct taking over into a work of art a real object or even an existing work of art."  *Cariou v. Prince*, 714 F.3d 694, 699-700, 712 (2d Cir. 2013) (holding that artworks that "incorporated partial or whole images" from a photography book constituted fair use); *see also, e.g.*, Artists Amici Br. Supporting Petitioner 7-35, *Andy Warhol Found. v. Goldsmith*, No. 21-869 (U.S. June 17, 2022) (explaining the origins and importance of appropriation art).

### C. Mr. Ripps Creates The RR/BAYC Project To Criticize Yuga Labs' Bored Ape Yacht Club Line Of NFTs

Yuga is a multi-billion-dollar company that attained its success by selling a series of 10,000 Non-Fungible Tokens (NFTs) known as the Bored Ape Yacht Club. ER-210. Individual "Bored Ape" NFTs have sold for as much as $3.4 million, and collections of them have sold for tens of millions of dollars. *Id.* Each Bored Ape NFT is associated with a cartoon image of an anthropomorphized ape. The Bored Ape NFTs have come under public scrutiny for, among other things, their depictions of apes with "hip hop" traits and apes wearing kamikaze headbands. ER-128–129 (citing statements from the Anti-Defamation League). Below are two Bored Ape images that display these features:


BAYC #3721


BAYC #6281

ER-142, 145.

This case arises from Mr. Ripps's public criticism of Yuga. Specifically, Mr. Ripps has argued that Yuga systematically embeds its products and promotional materials with imagery and references popular with neo-Nazis, alt-right groups, and racist bulletins within websites like 4chan.org/pol/. ER-5, 16–17, 226–228. Mr. Ripps has aired his criticism through "his Twitter and Instagram profiles, podcasts, and cooperation with investigative journalists, and by creating the website https://gordongoner.com." ER-5; *see also* ER-21, 228. Mr. Ripps has stated, for example, that Yuga's "BAYC logo" imitates the Nazi Totenkopf emblem for the Schutzstaffel (SS), the Nazi organization primarily responsible for the Holocaust. ER-5; *see also* ER-30–31. Below is a side-by-side comparison of the Bored Ape logo, the Nazi SS Totenkopf, and the satirical logo Ripps created for the RR/BAYC project to criticize Yuga:

  

ER-33, 26.

As is evident from the image, Yuga copied all salient features of the Totenkopf in the logo—even the 18 teeth in the symbol's skull. *See* ER-71 (Anti-Defamation League explaining that "18 is a white supremacists alphanumeric code

for Adolf Hitler"). The name of the company itself is problematic: The word "Yuga" references the alt-right phrase "Surf the Kali Yuga." Kali Yuga is the age of sin and conflict in Hinduism, and alt-right groups use the phrase "Surf the Kali Yuga" as an esoteric way of telling their followers to enjoy sin and embrace conflict. ER-89 (Rueda, *Neoecofascism: The Example of the United States*, 14 J. Study Radicalism 95, 110 (2020)); ER-114; ER-121–122 (*The Alt-Right Apocalypse*, The Marginalia Review of Books (2018)); *see also* ER-5 n.1 (district court summarizing Mr. Ripps's position that Yuga Labs "includes a neo-Nazi dog whistle because the word 'Yuga' is a reference to the phrase 'Surf the Kali Yuga,' which the alt-right uses as an esoteric way of saying enjoy sin and embrace conflict").

Mr. Ripps brought further attention to these issues by creating the satirical NFT collection called the "Ryder Ripps Bored Ape Yacht Club" ("RR/BAYC"). The RR/BAYC project is a collection of NFTs that each point to the same online digital *image* as an NFT in the Bored Ape collection, but use different entries ("ownership" certificates) on the blockchain. ER-17, 227. As Mr. Ripps explained to the district court, his "use of pointers to the same images is a form of appropriation art that serves several purposes: (1) to bring attention to Yuga's use of racist and neo-Nazi messages and imagery, (2) to expose Yuga's use of unwitting celebrities and popular brands to disseminate offensive material, (3) to

create social pressure demanding that Yuga take responsibility for its actions, and (4) to educate the public about the technical nature and utility of NFTs."  ER-5, 17, 26, 148.[4]

As the complaint acknowledges, Mr. Ripps has stated that the RR/BAYC project began "'organically,'" ER-229–230, with Mr. Ripps receiving requests for RR/BAYC NFTs on Twitter from like-minded users critical of Yuga, ER-17. Later, Mr. Ripps posted on Twitter that he would create his satirical NFTs for anyone who requested one for the price of 0.1 Ethereum (currently roughly $167). ER-151.  He explained to his followers that "ryder ripps bayc vision is to create an army of educators" with respect to Yuga's connections to neo-Nazi and alt-right culture.  ER-174.

The RR/BAYC NFTs and Mr. Ripps's campaign quickly gained traction, and Mr. Ripps set up the website https://rrbayc.com through which users could buy his satirical NFTs.  ER-26–28.  The website ensured that collectors understood the

---

[4] The Complaint at least incorporates by reference Mr. Ripps's website (https://rrbayc.com) and Twitter page by discussing and including hyperlinks to each of them.  *See* ER-226–227; *see also Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1007 (9th Cir. 2018) (incorporation by reference of a document referenced "several times" in the complaint); *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003) ("Even if a document is not attached to a complaint, it may be incorporated by reference into a complaint."); *Battle v. Taylor James, LLC*, 2022 WL 2162930, at *5 (C.D. Cal. June 15, 2022) (document incorporated by reference where the complaint "cites, discusses, and hyperlinks it").

satirical message of the project and that they were not purchasing a Bored Ape NFT. The front page of the website explained that his "re-minted" NFTs were a "new work … based on the BAYC images," by which those images were "recontextualized" to "illuminat[e] truths about their origins and meanings as well as the nature of Web3." ER-26. It went on to explain that "RR/BAYC uses satire and appropriation to protest and educate people regarding the Bored Ape Yacht Club and the framework of NFTs." *Id*. Mr. Ripps further required each purchaser to agree to a prominent disclaimer acknowledging that RR/BAYC NFTs are "a new mint of BAYC imagery, recontextualizing it for educational purposes, as protest and satirical commentary[.]" ER-18–19. Below is an image of that disclaimer taken from Mr. Ripps's website:



Ripps also took affirmative steps to ensure that any of his NFTs listed for sale on third-party websites prominently displayed their connection to his project. Ripps labeled any of his works that appeared on the OpenSea NFT marketplace as part of the RR/BAYC collection, and not the "Bored Ape Yacht Club" collection. ER-220. And on both the OpenSea and the Foundation NFT marketplaces, he labeled his NFTs with a satirical logo accusing the BAYC logo of being modeled on the Nazi Totenkopf. ER-220–221.

### D. Yuga Files Suit In Order To Silence Mr. Ripps Without Having To Directly Challenge The Veracity Of His Statements

On June 24, 2022, Yuga filed the underlying litigation against Mr. Ripps and his collaborator Jeremy Cahen. Rather than challenge the veracity of Appellants' assertions, Yuga's complaint raises a hodgepodge of trademark infringement, false advertising, and business tort claims. Specifically, Yuga brought federal claims for trademark infringement, false advertising, and cybersquatting (Claims 1-3). It also brought claims under California law for trademark infringement, unfair competition, and false advertising, all premised on Ripps's use of Yuga's trademarks (Claims 4-7, collectively the "state law trademark infringement claims"). Finally, the complaint alleges, *inter alia*, state law claims for conversion (Claim 9), and intentional and negligent interference with prospective economic advantage (Claims 10-11).[5] In response, Appellants have filed several counterclaims against Yuga, including (1) knowing misrepresentation of copyright infringement under 17 U.S.C. § 512(f) for filing improper DMCA takedown notices directed at Ripps's art, (2) a declaratory judgment that Yuga lacks a copyright in the Bored Ape images, and (3) intentional and negligent infliction of emotional distress. Dist. Ct. Dkt. 65.

---

[5] Yuga also brought a claim for unjust enrichment (Claim 8), which the district court dismissed. ER-8.

Despite Yuga's attempt to present its suit as a business dispute, the complaint itself repeatedly takes aim at Mr. Ripps's artwork and speech. For example:

- The complaint acknowledges that Mr. Ripps is a "self-proclaimed 'conceptual artist'" who has described his work as "satire." ER-205, 206, 226.

- Numerous allegations complain that "Ripps has targeted Yuga Labs in a campaign of harassment based on false accusations of racism." ER-205; *see also* ER-226 ("Since early 2022, Ripps has harassed and personally attacked Yuga Labs and its founders through baseless accusations of racism over social media networks like Twitter and Instagram."); ER-226–227 (explaining that Ripps "conducted an interview with a popular meme page, to spread this misinformation").

- The complaint refers to Ripps's "warped" version of Yuga's logo. ER-221.

- The complaint criticizes Ripps and Cahen's "parade of lies" related to the symbols in Yuga's work. ER-226.

- The complaint alleges that "Ripps' lies" about Yuga's racist imagery "have been widely discredited, but they have nonetheless reached a significant number of people on social media." ER-227.

- The complaint reproduces and discusses a tweet in which Ripps describes his work as a "provocation … working to take down" Yuga Labs. ER-229–230. The same tweet explains that Ripps's aim is "to illuminate what nfts are, and show bayc for what it really is." *Id*. It ends with the statement "LONG LIVE CONCEPTUAL ART." *Id*.

Appellants filed a motion to strike the complaint's state law claims under California's anti-SLAPP statute, and to dismiss the complaint in its entirety under Rule 12(b)(6). The court denied the anti-SLAPP motion on the ground that Yuga's claims did not "arise from" an act "in furtherance of" Ripps's and Cahen's "right of petition or free speech," as required by California law. ER-12–13 (quoting Cal. Code Civ. Proc. § 425.16(b)(1)). The district court found it significant that Yuga had "not brought claims … for defamation, slander, or libel" despite "Ripps's public criticism of [Yuga's] use of purportedly racist, neo-Nazi, and alt-right dog whistles … through Twitter, Instagram, podcasts, and the website gordongoner.com." ER-14. Instead, the court concluded that Yuga's "claims are limited to and arise out of [Ripps's] unauthorized use of the [Bored Ape Yacht Club] Marks for commercial purposes." ER-14.

Because the district court concluded that Appellants had not shown that the anti-SLAPP statute applied, the court did not reach the follow-on question of whether the complaint was legally sufficient for purposes of the anti-SLAPP

statute.  ER-14.  However, the court effectively addressed that question in the context of resolving Appellants' Rule 12(b)(6) motion, rejecting Appellants' arguments that their conduct was protected either under the First Amendment or under the doctrine of nominative fair use.[6]

Specifically, the court concluded that Ripps's use of Yuga's marks was not "'part of an expressive work protected by the First Amendment.'"  ER-9.  The court stated that "the RR/BAYC NFTs do not express an idea or point of view, but, instead, merely 'point to the same online digital images associated with the BAYC collection.'"  *Id.*  And Ripps's activities promoting that collection were likewise "not expressive artistic speech," but instead "commercial activities designed to sell infringing products."  ER-10.  The court went on to hold that even if Appellants' conduct implicated the First Amendment, their actions fell outside its protection. That was so, the court stated, because Ripps's use of Yuga's marks was not "artistically relevant" to Ripps's art (because it was a "'pretextual expressive work meant only to disguise a business'") and his use of the marks was "explicitly

---

[6] Although the district court's Rule 12(b)(6) analysis applied to both Yuga's state and federal claims, the federal claims themselves are not at issue in this appeal. This Court only has jurisdiction over the district court's denial of Appellants' anti-SLAPP motion, which only challenged the state law claims.  *See Hilton*, 599 F.3d at 900-902.

misleading" (because Ripps used Yuga's marks to make his "competing product look[] identical to [Yuga]'s product"). *Id.*

The district court rejected Appellants' nominative fair use argument on the ground that the doctrine did not apply because Ripps was "not using the [Bored Ape Yacht Club] Marks to sell" Yuga's NFTs, "but to sell [his] own competing RR/BAYC NFTs." ER-11. In any event, the district court concluded that Appellants could not satisfy the doctrine's requirements because they "frequently used the entirety of the [Bored Ape Yacht Club] Marks without modification" and because their "'prominent[] and bold[]'" use of those marks "'suggest[ed] sponsorship.'" ER-11–12.

Finally, the district court rejected Appellants' challenge to Yuga's non-trademark state law claims (for conversion as well as intentional and negligent interference) without explanation, stating only that the issues were "more appropriately resolved on a motion for summary judgment." ER-12.

## SUMMARY OF THE ARGUMENT

The district court wrongly concluded that California's anti-SLAPP statute did not apply to Yuga's state law claims. Those claims "aris[e] from … conduct in furtherance of" Appellants' free speech rights because they are rooted in Appellants' public criticism of Yuga—criticism that could not be made effectively without at least partially using Plaintiff's trademarks. That the state law claims are

not expressly labeled as defamation, libel, or slander makes no legal difference, as whether the anti-SLAPP statute applies turns on the underlying conduct rather than the type of claim. Moreover, the fact that Mr. Ripps's work was sold rather than given away does not change the analysis—the First Amendment's protection extends to paid and unpaid speech alike.

While the district court's threshold error is sufficient grounds for reversal, this Court can and should take the next step and hold that Yuga has not stated a claim with respect to any of its state law causes of action. Specifically, Yuga's state law trademark claims are barred by the First Amendment because Appellants used Yuga's trademarks as part of an expressive work and in a way that was both relevant to the underlying work and that did not explicitly mislead consumers about the source of the work. This is because the RR/BAYC collection communicated a specific, critical message about the Bored Ape Yacht Club that was likely to be understood by purchasers, employed Yuga's trademarks to criticize their use of racist/antisemitic imagery, and took pains to disavow Yuga's marks due to that imagery. In any event, Yuga's trademark claims independently fail under the doctrine of nominative fair use because Appellants' critique required use of Yuga's marks, Appellants used no more of the marks than was reasonably necessary, and Appellants did not suggest Yuga's sponsorship or endorsement.

This analysis also disposes of Yuga's three remaining state law claims, all of which are predicated on the existence of a live trademark infringement claim. In any event, the complaint does not state a viable claim for conversion (because the mere use of another's trademarks does not constitute conversion as a matter of law) or negligent or intentional interference with prospective economic advantage (at a minimum because Plaintiffs have failed to identify a specific relationship with which Appellants interfered).

## ARGUMENT

### I. THE DISTRICT COURT ERRED IN HOLDING APPELLANTS DID NOT SATISFY THE THRESHOLD SHOWING THAT YUGA'S STATE LAW CLAIMS AROSE FROM AN ACT IN FURTHERANCE OF PROTECTED SPEECH

California is one of many states that seek to discourage "Strategic Lawsuits Against Public Participation, or SLAPPs"—i.e., cases that "'masquerade as ordinary lawsuits but are intended to deter ordinary people from exercising their political or legal rights or to punish them for doing so.'" *Planet Aid, Inc. v. Reveal*, 44 F.4th 918, 923 (9th Cir. 2022).[7] To that end, California's anti-SLAPP statute permits a defendant to file a special motion to strike claims that fall within the statute's ambit. The preliminary consideration is whether the defendant can make

---

[7] The denial of an anti-SLAPP motion that challenges the legal sufficiency of the claims is reviewed de novo. *See Jordan-Benel v. Universal City Studios, Inc.*, 859 F.3d 1184, 1188 (9th Cir. 2017); *Planned Parenthood Fed'n of Am., Inc. v. Center for Med. Progress*, 890 F.3d 828, 832 (9th Cir. 2018).

"a threshold showing that the challenged cause of action is one arising from protected activity." *Taus v. Loftus*, 151 P.3d 1185, 1197 (Cal. 2007); *see also Langer v. Kiser*, 57 F.4th 1085, 1105 (9th Cir. 2023) (same). "Protected activity" includes, as relevant here, "any … conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." Cal. Code Civ. Proc. § 425.16(e). If the defendant makes its threshold showing, the court then considers "'whether the plaintiff has demonstrated a probability of prevailing on the claim.'" *Taus*, 151 P.3d at 1197; *Langer*, 57 F.4th at 1105-1106; *see also Planned Parenthood Fed'n of Am., Inc. v. Center for Med. Progress*, 890 F.3d 828, 834-835 (9th Cir. 2018) (12(b)(6) standard applies when determining probability of success where anti-SLAPP motion challenges the legal sufficiency of a claim).

Both the California Legislature and the California Supreme Court have instructed that the anti-SLAPP statute should broadly construed. In 1997, the Legislature amended the statute to add the requirement that the statute "shall be construed broadly." Cal. Code Civ. Proc. § 425.16(a). And the California Supreme Court has interpreted the statute in a manner that "conforms to the Legislature's express requirement of broad construction." *Equilon Enters. v. Consumer Cause, Inc.*, 52 P.3d 685, 689 (Cal. 2002).

California courts have understood the broad construction requirement to mean that "a plaintiff cannot avoid operation of the anti-SLAPP statute … through artifices of pleading," such as by "characteriz[ing] an action as a garden variety tort or contract claim when in fact the claim is predicated on protected speech or conduct." *Trilogy at Glen Ivy Maint. Ass'n v. Shea Homes, Inc.*, 235 Cal. App. 4th 361, 368 (2015) (quotation marks omitted). Rather, in determining whether a defendant can make the threshold showing that the suit targets conduct arising out of protected speech, courts must "disregard the labeling of the claim" and instead "examine the principal thrust or gravamen of a plaintiff's cause of action." *Id.* (emphasis omitted). In sum, "[n]othing in the [anti-SLAPP] statute categorically excludes any particular type of action from its operation." *Navellier v. Sletten*, 52 P.3d 703, 711 (Cal. 2002).

Here, the gravamen of Yuga's state law claims is that Appellants infringed Yuga's trademarks—or otherwise wronged Yuga—by using those marks in Ripps's artistic campaign to publicize his concerns that the company was relying on racist/antisemitic imagery and in order to comment on the misleading concept of "owning" NFTs. As the complaint acknowledges, Ripps created the RR/BAYC project with the stated aim of publicizing how Yuga's founders have embedded Yuga and the Bored Ape collection with racist and neo-Nazi imagery. ER-226–227. It is undisputed that Mr. Ripps was engaged in a long-running effort to focus

public attention on Yuga's products on both Twitter and Instagram, ER-205–206, and via his website gordongoner.com, ER-222 (displaying the RR/BAYC Twitter profile, which directs viewers to visit gordongoner.com for "the truth"). The RR/BAYC project was simply the next step in Ripps's criticism of Yuga. Yuga specifically alleged in the complaint that Ripps had stated that commissioning an RR/BAYC NFT was an act of protest against Yuga—a way of saying "fuck off to" the Bored Ape Yacht Club. ER-232, 239; *cf. Cohen v. California*, 403 U.S. 15, 17, 25 (1971) (holding that "jacket bearing the words 'Fuck the Draft'" was protected speech under the First Amendment, as "one man's vulgarity is another's lyric").

The ideas that the RR/BAYC project expressed quickly gained attention— i.e., Ripps's message "reached a significant number of people." ER-227. And Ripps's artistic message was the very essence of the RR/BAYC collection—as the complaint explains, Ripps's "accusations" of racism against BAYC were exactly what "fuel[ed] sales of" Ripps's NFTs. ER-205–206. Ripps also ensured that collectors understood the satirical messages of his NFTs by including in that website a prominent disclaimer acknowledging that the RR/BAYC NFTs are "a new mint of BAYC imagery, recontextualizing it for educational purposes, as protest and satirical commentary." ER-18–19; *see also supra* pp. 11-13. Almost all of Mr. Ripps's NFT sales were conducted through that website, and Mr. Ripps is not aware of a single person who purchased one of his NFTs under the

impression that it was an original Bored Ape NFT.  ER-18, 19.  In sum, the

RR/BAYC project—and the NFTs that form the centerpiece of both that project

and this litigation—was an expression of the "constitutional right of free speech in

connection with … an issue of public interest."  Cal. Code Civ. Proc. § 425.16(e).[8]

The district court erred in concluding that Yuga's claims arose from

something other than Ripps's expressive work.  The court's primary reason for that

holding was that Yuga declined to bring "claims against Defendants for

defamation, slander, or libel," but instead "limited" its claims to those that "arise

out of [Ripps's] unauthorized use of the BAYC Marks for commercial purposes."

ER-14.  But that approach wrongly focuses on "the form of the plaintiff's cause of

action" rather than on the defendants' litigation-provoking activity.  *Navellier*, 52

P.3d at 711.  As explained, it makes no difference to the anti-SLAPP statute that

Yuga's claims relate to intellectual property, rather than speech.  *See supra* p. 22.

Courts have held that such claims can fall under the anti-SLAPP statute.  *See, e.g.*,

---

[8] Yuga rightly has not disputed that Appellants' speech is on a matter of public interest.  An issue of public interest is "'something of concern to a substantial number of people,'" *Sarver v. Chartier*, 813 F.3d 891, 902 (9th Cir. 2016), and has been held satisfied by even fairly idiosyncratic issues, *e.g.*, *Kronemyer v. Internet Movie Database, Inc.*, 150 Cal. App. 4th 941, 949-951 (2007) (IMDB's policy about who was listed as an executive producer of the movie "My Big Fat Greek Wedding"); *Cross v. Facebook*, 14 Cal. App. 5th 190, 200 (2017) ("the danger of trucks on highways driven by sleep-deprived drivers").  Here, the complaint itself acknowledges that the Bored Ape NFT collection is "one of the world's most well-known and successful," ER-204, meaning that the public undoubtedly has an interest in whether it includes racist or antisemitic imagery.

*Mindys Cosmetics, Inc. v. Dakar*, 611 F.3d 590, 598 (9th Cir. 2010) (suit targeted filing of a trademark application); *Hilton v. Hallmark Cards*, 599 F.3d 894, 901 (9th Cir. 2010) (right of publicity claim). Looking past the label of a claim makes particular sense in the context of satire and appropriation art—or indeed any other kind of artistic endeavor where the work's effectiveness hinges on the use of a target's intellectual property. *See Mattel Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 810-811 (9th Cir. 2003) ("It would have been extremely difficult … to create a photographic parody of Barbie without actually using the doll."); *see also Cariou v. Prince*, 714 F.3d 694, 705 (2d Cir. 2013) (observing, in the context of appropriation art, that "'activity and progress in the arts for the intellectual enrichment of the public'" would be stifled by "'excessively broad protection'" of intellectual property).

The district court also stated that because Ripps's use of Yuga's marks was "heavily commercial," Plaintiffs' claims directed at that use did not "'arise from'" acts "'in furtherance of [Appellants'] right of petition or free speech.'" ER-14. But the fact that a creative work is "sold commercially" does not make it a stranger to the First Amendment. *See Punchbowl, Inc. v. AJ Press, LLC*, 52 F.4th 1091, 1097 (9th Cir. 2022) ("A work … is not rendered non-expressive simply because it is sold commercially."). Rather, "[s]ome of our most valued forms of fully protected speech are uttered for a profit," *Board of Trustees of State University of*

*New York v. Fox*, 492 U.S. 469, 482 (1989), and even "the pamphlets of Thomas Paine were not distributed free of charge," *Murdock v. Pennsylvania*, 319 U.S. 105, 111 (1943).

## II. HAD THE DISTRICT COURT APPLIED THE PROPER "ARISING FROM" STANDARD, YUGA WOULD NOT HAVE BEEN ABLE TO ESTABLISH A PROBABILITY OF PREVAILING ON ITS STATE LAW CLAIMS

The district court's error in holding that Yuga's suit does not arise out of protected conduct is sufficient grounds for reversal, and this Court could simply "remand the matter to the trial court to conduct the second prong analysis." *Wallace v. McCubbin*, 128 Cal. Rptr. 3d 205, 225 (Ct. App. 2011). But "in the spirit of judicial economy," this Court can and should also resolve the ultimate question of whether Yuga failed to state a claim with respect to any of its state law causes of actions. *See Greater L.A. Agency on Deafness, Inc. v. Cable News Network, Inc.*, 742 F.3d 414, 425 (9th Cir. 2014) (addressing the merits even though district court did not reach the issue because it wrongly held anti-SLAPP statute was inapplicable).

### A. Yuga's State Law Trademark Claims Fail Under The *Rogers* Free Speech Test

If a trademark infringement defendant makes "a threshold legal showing that [his] allegedly infringing use is part of an expressive work protected by the First Amendment[,] … then the plaintiff claiming trademark infringement bears a heightened burden." *Gordon v. Drape Creative, Inc.*, 909 F.3d 257, 264 (9th Cir.

2018) (citing *Rogers v. Grimaldi*, 875 F.2d 994 (9th Cir. 1989)). A plaintiff can only overcome that hurdle if it establishes the use of a trademark is either "'not artistically relevant to the underlying work'" or "'explicitly misleads consumers as to the source or the content of the work.'" *Punchbowl*, 52 F.4th at 1097.[9] "Neither of [those] prongs is easy to meet," *Dr. Seuss Enters., LP v. ComicMix LLC*, 983 F.3d 443, 462 (9th Cir. 2020), and Yuga cannot satisfy either.

### 1. The RR/BAYC NFTs are an expressive work

A work is expressive if it "evinces an intent to convey a particularized message, and in the surrounding circumstances the likelihood was great that the message would be understood by those who viewed it." *Gordon*, 909 F.3d at 268 (quotation marks omitted). Here, even the complaint acknowledges Ripps's explanation that he uses Bored Ape marks in his conceptual appropriation art as a "provocation" that serves "to illuminate what nfts are and show bayc for what it really is." ER-229–230. Yuga also alleges that Ripps sold RR/BAYC NFTs so collectors could protest the racist imagery in Yuga's products. ER-232, 239.

---

[9] This test applies to all of Yuga's state law trademark infringement causes of action—i.e., trademark infringement, unfair competition, and false advertising. *See Twentieth Century Fox Television v. Empire Distrib., Inc.*, 875 F.3d 1192, 1195-1199 (9th Cir. 2017) (applying *Rogers* test to false designation of origin, unfair competition, and false advertising under California Law); *Dr. Seuss Enters., LP v. ComicMix LLC*, 983 F.3d 443, 461 (9th Cir. 2020) (common law trademark infringement); *E.S.S. Ent. 2000, Inc. v. Rock Star Videos, Inc.*, 547 F.3d 1095, 1098, 1101 (9th Cir. 2008) (trademark infringement and unfair competition claims).

Finally, Yuga alleges that Ripps promoted his project with the statement, "LONG LIVE CONCEPTUAL ART." ER-229–230. As Ripps's webpage summarizes, "RR/BAYC uses satire and appropriation to protest and educate people regarding The Bored Ape Yacht Club and the framework of NFTs" and "[t]he work is an extension of and in the spirit of other artists who have worked within the field of appropriation art." ER-26 (emphasis omitted).[10]

The district court wrongly held (in the context of resolving Appellants' Rule 12(b)(6) motion) that the RR/BAYC collection was not an expressive work, apparently because it evaluated that collection in total isolation from Ripps's larger public awareness campaign. ER-9–10. But "[c]ontext is everything" when it comes to assessing whether conduct is protected by the First Amendment. *Edge v. City of Everett*, 929 F.3d 657, 669 (9th Cir. 2019). Here, the RR/BAYC collection was accompanied by the artist's statement of purpose and a social media campaign explaining its message. Ripps's website also required purchasers to agree to a prominent disclaimer explaining the artistic purpose of the NFTs before any

---

[10] As noted above, at least the webpage https://rrbayc.com is incorporated by reference in the complaint. *See supra* p. 11 n.4. Out of an abundance of caution, however, Appellants have filed a simultaneous motion requesting judicial notice of the webpage and other exhibits filed with the district court for purposes of analyzing whether Yuga's complaint is legally sufficient.

purchase could be made. Both made the "likelihood … great" that purchasers would understand Ripps's message. *Id*.

While the district court stated that Ripps's "commercial activities designed to sell" NFTs were not themselves expressive works, ER-10, even uses of a mark that "fall outside the … body of an expressive work" and thus might be viewed as non-expressive in isolation—for instance, "promotional efforts" like "the sale or licensing of consumer goods" that utilize another's trademark to advertise an expressive work—are protected by the First Amendment when they are "auxiliary" to that expressive work. *Twentieth Century Fox Television v. Empire Distrib., Inc.*, 875 F.3d 1192, 1196-1197 (9th Cir. 2017). So when, for example, the record label "Empire Distribution" sued Fox Television for selling branded t-shirts and champagne glasses promoting the television show "Empire," the fact that the *show* was expressive sufficed to defeat the label's claim, even though the merchandise at issue in the suit was not itself expressive. *See id.* at 1196-1197. For the reasons just explained, the sale of the RR/BAYC collection was independently expressive—i.e., because that sale communicated a specific, critical message about the Bored Ape Yacht Club that was likely to be understood by purchasers. But even if it was not, it was at the very least "auxiliary" to an expressive work, in the same sense as goods sold to promote a television show. The purpose of the NFT sales was to enable Ripps's supporters to join him in expressing disapproval of the

Bored Ape NFTs, ER-227, and "to educate people' about [Bored Apes] and NFTs," ER-196–197. In other words, the NFTs' purpose was to amplify Ripps's broader artistic effort to criticize Yuga's connections to neo-Nazi and alt-right culture—analogous to a promotional campaign expanding the audience for a television show.

### 2. The RR/BAYC NFTs have artistic relevance and are not explicitly misleading

Because the RR/BAYC NFTs constitute an expressive work, Yuga's state law trademark claims should be dismissed under the anti-SLAPP statute unless Yuga establishes that the NFTs lack artistic relevance or are explicitly misleading. Yuga can make neither showing.

As to the former, "[a]rtistic relevance" requires little from a defendant: "[T]he level of relevance merely must be above zero[.]" *Gordon*, 909 F.3d at 268 (quotation marks omitted). In other words, "only the use of a trademark with '*no artistic relevance to the underlying work whatsoever*' does not merit First Amendment protection." *E.S.S. Ent. 2000, Inc. v. Rock Star Videos, Inc.*, 547 F.3d 1095, 1100 (9th Cir. 2008).

Appellants' use of Yuga's marks clears that low bar. The complaint makes plain that the RR/BAYC project uses the asserted trademarks to express criticism of Yuga's use of racist/antisemitic imagery and references. Ripps relied on the Bored Ape Yacht Club name to identify the subject of his critique, and on Yuga's

marks to create a satirical counterpart to the Bored Ape Yacht Club—a counterpart that proved successful at spreading Ripps's artistic message. *See supra* p. 23.

The district court's contrary conclusion relied on dicta from *Twentieth Century Fox*, 875 F.3d at 1196-1197, which the court characterized as establishing that a "pretextual expressive work meant only to disguise a business profiting from another's trademark" falls outside the First Amendment's protection. *See* ER-10. But the *Twentieth Century Fox* Court was discussing the threshold "expressive work" requirement, not "artistic relevance." 875 F.3d at 1197. In any event, the district court did not and could not point to any non-conclusory allegation in the complaint to support the notion that Ripps's artistic work was "pretextual." To the contrary, the complaint alleges that Ripps has tried to "harass[]" Yuga "based on false accusations of racism" and to "tarnish or disparage" its brand, ER-205–206, 234—actions that would presumably *hurt* the market for a meaningless duplicate of the Bored Ape NFTs, not bolster it.

As to whether the RR/BAYC NFTs were explicitly misleading, Yuga faces a "high bar," as there must be "an explicit indication, overt claim, or explicit misstatement about the source of the work." *Dr. Seuss Enters.*, 983 F.3d at 462. Ordinarily, "the mere use of a trademark alone cannot suffice to make such use explicitly misleading." *E.S.S. Ent. 2000*, 547 F.3d at 1100.

Here, Ripps took pains to differentiate his use of the marks from Yuga's. His website repeatedly and clearly informed visitors that his NFTs were not original Bored Apes, but instead artworks criticizing and protesting the Bored Ape Yacht Club. ER-18–19, 26. He made purchasers agree to a disclaimer reiterating that point. ER-18–19, 26. He ensured that third-party websites listing his NFTs also labeled them as parts of his project, and not as original Bored Apes. ER-220–221. And Yuga's complaint expressly alleges that, on social media, he repeatedly publicized his satirical vision and called on others to purchase his NFTs as a way of *criticizing* the Bored Ape Yacht Club—a far cry from portraying his NFTs as original Bored Ape Yacht Club NFTs. ER-229, 232, 239. As this Court has explained, "[a]n expressive work is less likely to be misleading when it clearly discloses its origin." *Punchbowl*, 52 F.4th at 1102. Ripps's works did precisely that.

## B. In The Alternative, Yuga's State Law Trademark Claims Fail Because Ripps's Use Of Yuga's Marks Is Nominative Fair Use

Yuga's state law trademark claims also fail because Appellants' use of its asserted marks qualifies as protected nominative fair use. A defendant's use of a mark is protected nominative fair use when: (1) "the plaintiff's product or service in question [is] not readily identifiable without use of the trademark," (2) "only so much of the mark or marks [is] used as is reasonably necessary to identify the plaintiff's product or service," and (3) "the user [does] nothing that would, in

conjunction with the mark, suggest sponsorship or endorsement by the trademark holder." *Mattel*, 353 F.3d at 810.[11]

The district court wrongly held that nominative fair use was inapplicable on its face because (in its view) the doctrine does not apply when a defendant uses a mark to refer "to something other than the plaintiff's product." ER-11 (quoting *New Kids on the Block v. News Am. Publ'g, Inc.*, 971 F.2d 302, 308 (9th Cir. 1992)). Because Appellants purportedly used the BAYC marks only to sell their own products (as opposed to referencing Yuga's Bored Apes), the district court concluded the doctrine could not apply as a matter of law. *Id.* To be clear, nominative fair use does not require that the mark be used with the ultimate goal of selling or promoting the trademark holder's intellectual property—it would serve little purpose if it did. Rather, "a defendant's use of a plaintiff's mark is nominative where he or she used the plaintiff's mark to describe the plaintiff's product, even if the defendant's ultimate goal is to describe"—and sell—"his own product." *Mattel*, 353 F.3d at 809 (emphasis and quotation marks omitted). That

---

[11] Nominative fair use is applicable to all of the state law trademark claims. *See Applied Underwriters, Inc. v. Lichtenegger*, 913 F.3d 884, 889, 893-898 (9th Cir. 2019) (applying nominative fair use to unfair competition claim under California common law); *New Kids on the Block v. News Am. Publ'g, Inc.*, 971 F.2d 302, 305-309 (9th Cir. 1992) (applying nominative fair use to common law trademark infringement and false advertising under California law).

is exactly what Ripps did, drawing a contrast between his NFTs and Yuga's for "purposes of … criticism." *New Kids on the Block*, 971 F.2d at 306.

When the district court's misunderstanding of the circumstances under which nominative fair use applies is set aside, Ryder satisfies the three-factor test laid out in *Mattel*.

***First***, Ripps's project would not be possible without using Yuga's marks to reference the Bored Ape collection, just as a critical book review would serve little purpose if it could not use trademarked terms like "Harry Potter" to identify the book at issue. As discussed above, the Complaint includes Ripps's explanation that his project uses Bored Ape marks in his conceptual appropriation art as a "provocation" that serves to "show bayc for what it really is." *See supra* pp. 16, 27. Put slightly differently, Ripps "needed to communicate" to his audience that the RR/BAYC project critiques Yuga and its Bored Ape collection; "using the mark in the title and description of the program 'accomplished this goal.'" *Applied Underwriters v. Lichtenegger*, 913 F.3d 884, 894 (9th Cir. 2019).

***Second***, Ripps used Yuga's marks only to the extent reasonably necessary. The RR/BAYC project is a satirical work that uses unique and identifiable NFTs that point to the same online digital images associated with the Bored Ape collection. ER-26, 229–230. Thus, the "nature" of Ripps's performance and appropriation art project necessarily requires use of Yuga's marks (both in the title

of the collection and in the digital images themselves) to accomplish the goal of criticizing Yuga. *See Applied Underwriters*, 913 F.3d at 895.

The district court's suggestion that that Ripps could not meet the requirements for nominative fair use because he "frequently used the entirety of the BAYC Marks without modification," ER-11, is both factually and legally inaccurate. As to the former, at least some of Ripps's work *did* modify Yuga's marks—most obviously by modifying Yuga's logo to highlight its antisemitic origins. *See supra* p. 9. And as to the latter (the law), the question is not whether Ripps modified Yuga's marks, but rather whether he used "only … so much of a trademark … as [was] reasonably necessary." *Mattel*, 353 F.3d at 811. Ripps used Yuga's marks "without modification" in only two ways: by using the phrase "Bored Ape Yacht Club" and its corresponding logo in various ways throughout his work, and by ensuring that his NFTs and Yuga's pointed to identical images, some of which contain Bored Ape marks.

Both wholesale uses were essential to Ripps's work. He had to invoke the Bored Ape name and logo to identify the subject of his critique, and to highlight the similarity of the company's logo to the Nazi Totenkopf. And his critique also required his NFTs to point to images identical to those associated with Yuga's. A key aspect of Ripps's project was to educate the public about the nature of NFTs— i.e., that the buyer of the NFT does not necessarily have any right to the linked-to

image (or song or video). *See supra* pp. 5-7, 10-11. Nor does an NFT restrict the sharing or copying of the linked-to file or prevent the creation of NFTs that reference identical files. *See supra* pp. 5-7, 10-11. That "widely misunderstood" feature of NFTs is exactly what Ripps sought to make salient. ER-26. And minting NFTs to show that countless NFTs can all point to the same image— without "copying" any NFT itself—naturally requires minting an NFT that points to the same image as another NFT. *Cf.* Def's Opposition, Dist. Ct. Dkt. 53, at 8 (acknowledging that NFTs are "tokens that 'point to … online digital images'").

*Third*, the complaint's allegations make clear that Ripps has sought to *disassociate* himself from Yuga by *criticizing* Yuga's use of racist and neo-Nazi imagery. *See supra* pp. 15-16, 22-23, 27-32. This Court has held that even statements that merely *imply* criticism of the mark owner are sufficient to establish that the no endorsement/sponsorship element is met. *See, e.g.*, *New Kids on the Block*, 971 F.2d at 308-309 ("[N]othing in the announcements suggests joint sponsorship or endorsement by the New Kids. The USA Today announcement implies quite the contrary by asking whether the New Kids might be 'a turn off.'"). Ripps has been explicit in his criticisms of Yuga, thus going above and beyond what is required to satisfy this element. *Mattel*, 353 F.3d at 811 (this "element does not require that the defendant make an affirmative statement that their product is not sponsored by the plaintiff").

### C.     Yuga's Remaining State Law Claims Fail

Yuga has likewise failed to adequately allege its (nominally) non-trademark claims.  The district court (in the context of its Rule 12(b)(6) ruling) declined to consider Appellants' arguments as to those claims without explanation, noting only that it believed that they should be resolved at summary judgment.  ER-12.  This was improper, as a "trial court owes the parties and a reviewing court a reasoned resolution of the factual and legal disputes presented by a case." *Muniz v. United Parcel Serv., Inc.*, 738 F.3d 214, 226 (9th Cir. 2013); *see also Padgett v. Loventhal*, 706 F.3d 1205, 1207-1208 (9th Cir. 2013) (remanding for more complete explanation from district court).  The district court's failure to provide even the most cursory explanation for its ruling is made worse by the fact that Yuga's claims are legally insufficient on their face.

#### 1.     Yuga's conversion claim fails

Yuga alleges that Appellants committed conversion by "substantially interfer[ing] with Yuga Labs' ownership and rights" in its trademarks.  *See* ER-241.  This Court has never recognized such a claim, and district courts have repeatedly declined to extend conversion to the mere use of another's trademarks. *See Meeker v. Meeker*, 2004 WL 2554452, at *6 (N.D. Cal. Nov. 10, 2004) ("[A] claim for conversion should not be extended to reach the intangible intellectual property rights in a trademark."); *Innospan Corp. v. Intuit, Inc.*, 2010 WL

5017014, at *2 (N.D. Cal. Dec. 3, 2010) (similar). This is for good reason: otherwise, "the tort of conversion could largely displace the IP laws" and allow plaintiffs to circumvent the law's "carefully constructed requirements for trademark protection." 4 *McCarthy on Trademarks and Unfair Competition* § 25:70 (5th ed. 2022). As a result, "courts that have been faced with a claim that a trademark has been 'converted' have rejected the concept outright." *Id.*

To be sure, a handful of district courts have recognized a viable conversion claim in the context of the extreme fact pattern where a party has attempted to comprehensively usurp ownership of another's mark. *See, e.g.*, *Nam v. Alpha Floors, Inc.*, 2017 WL 11635994, at *8 (C.D. Cal. Jan. 4, 2017) (defendant contacted the plaintiff's customers, claimed to own the rights to the plaintiff's brand name, and then physically removed the plaintiff's products from its customers' retail stores); *English & Sons, Inc. v. Straw Hat Rests., Inc.*, 176 F. Supp. 3d 904, 920 (N.D. Cal. 2016) (entity had "purport[ed] to transfer" "'intellectual property to'" another by registering ownership of the trademark with the U.S. Patent and Trademark Office, "'without actually owning' that property"). But Yuga's complaint at most alleges only run-of-the-mill infringement—a matter for trademark law, not tort law.

In any event, to state a claim for conversion, Yuga must allege a "right to possession of property" and the "wrongful disposition of the property right[.]"

- 38 -

*Kremen v. Cohen*, 337 F.3d 1024, 1029 (9th Cir. 2003) (quotation marks omitted). The only basis for "wrongful disposition" alleged in the complaint is that Appellants purportedly "substantially interfered with Yuga Labs' ownership and rights in these marks." ER-241. As discussed above, Yuga has not adequately alleged trademark infringement. Accordingly, it cannot allege wrongful disposition of property via any such trademark infringement.

### 2. Yuga's claim for intentional interference with prospective economic advantage fails

Yuga alleges that Appellants appropriated Yuga's trademarks, engaged in unfair competition and false advertising, and offered a fake product to devalue Yuga's NFTs—all of which, it says, interfered with the relationship between Yuga and its customers or potential customers. ER-242–243.

But to state a claim for intentional interference, Yuga must plead that the defendant engaged in an independently "wrongful" act as defined by some constitutional, statutory, regulatory, or other legal standard. *Marin Tug & Barge, Inc. v. Westport Petroleum, Inc.*, 271 F.3d 825, 831 (9th Cir. 2001). Here, the only supposed independently wrongful act Yuga has identified is the infringement of Yuga's trademarks. ER-242–243. And again, because Yuga has not plausibly alleged trademark infringement, it cannot rely on those allegations to satisfy the independently wrongful act element.

- 39 -

In addition, Yuga has failed to allege a specific economic relationship that Appellants disrupted. *See Korea Supply Co. v. Lockheed Martin Corp.*, 63 P.3d 937, 949–950 (Cal. 2003) (holding that intentional interference requires alleging specific examples of disruption). Yuga merely alleged that "[a]n economic relationship existed between Yuga Labs and individuals who have purchased Bored APE NFTs" and that "prior purchasers of Bored Apes 'dumped' Yuga Labs NFTs in favor of … RR/BAYC NFTs." ER-242, 243. Such sweeping allegations are too conclusory to survive dismissal. Rather, a plaintiff must allege specific and actual instances of disruption—for example, that it "lost a contract" with a particular customer, or that "a negotiation with a [c]ustomer failed." *Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137, 1151 (9th Cir. 2008) (affirming dismissal of intentional interference claim). In short, because Yuga has failed to allege "an existing relationship with an identifiable buyer," its claim cannot stand. *Westside Ctr. Assocs. v. Safeway Stores 23, Inc.*, 42 Cal. App. 4th 507, 527 (1996).

### 3. Yuga's claim for negligent interference with prospective economic advantage fails

Finally, Yuga alleges that Appellants negligently interfered by appropriating Yuga's trademarks, engaging in unfair competition and false advertising, and offering a competing fake product. ER-244–245. Just like its intentional interference claim, Yuga's negligent interference claim relies on its trademark infringement allegations. *Id.*; *see also National Med. Transp. Network v. Deloitte*

& *Touche*, 62 Cal. App. 4th 412, 439-440 (1998) (negligent interference requires an "independently wrongful" act). And again, Yuga failed to plausibly allege trademark infringement.

Moreover, just as with its intentional interference claim, Yuga must allege "an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff." *Denims v. Ram Imports, Inc*, 2021 WL 4814995, at *3 (C.D. Cal. Mar. 5, 2021). And once again, Yuga merely states in a general manner that it had an existing business relationship with customers who "purchased Bored Ape NFTs," ER-244, without identifying the kind of specific relationship required. *See Ketab Corp. v. Mesriani Law Grp.*, 2016 WL 5920291, at *10 (C.D. Cal. Jan. 29, 2016) (a plaintiff claiming negligent interference "must identify with particularity the relationships or opportunities [with] which Defendant is alleged to have interfered").

Finally, Yuga has failed to adequately plead that Appellants owed a duty of care to Yuga. *See J'Aire Corp. v. Gregory*, 598 P.2d 60, 62-63 (Cal. 1979) (negligent interference requires duty of care); *Hsu v. OZ Optics Ltd.*, 211 F.R.D. 615, 621 (N.D. Cal. 2002) (same). To the contrary, Yuga has alleged that Defendants are Yuga's "competitors in the market for NFTs." ER-231, 232, 239. There cannot be a duty of care between competitors. *See Stolz v. Wong Comm'ns. LP*, 25 Cal. App. 4th 1811, 1825 (1994) ("The complaint did not allege such a

duty, nor could it, since it was plain that plaintiff and defendants were competitors.").

## CONCLUSION

Because the district court erroneously concluded that the anti-SLAPP statute did not apply to Yuga's state law claims, and because those claims fail as a matter of law, this Court should reverse the district court's decision and order it to strike those claims.

Respectfully submitted,

/s/ Louis W. Tompros

THOMAS G. SPRANKLING
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2600 El Camino Real
Suite 400
Palo Alto, CA 94306
(650) 858-6062

LOUIS W. TOMPROS
ANDREW P. MELENDEZ
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6886

HENRY M. NIKOGOSYAN
WILMER CUTLER PICKERING
  HALE AND DORR LLP
350 South Grand Avenue
Suite 2400
Los Angeles, CA 90071
(213) 443-5316

ANDREW K. WAKS
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20006
(202) 663-6297

February 21, 2023

**STATEMENT OF RELATED CASES**

There are no related cases currently pending before this Court.

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 22-56199

I am the attorney or self-represented party.

**This brief contains** | 9,506 | **words,** including | 110 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.

☐ a party or parties are filing a single brief in response to multiple briefs.

☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated [ ].

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/Louis W. Tompros | **Date** | 2/21/2023

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**                                                                 *Rev. 12/01/22*

## CERTIFICATE OF SERVICE

I hereby certify that on this 21st day of February, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the appellate CM/ECF system. Counsel for all parties to the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

/s/  Louis W. Tompros
LOUIS W. TOMPROS